FILED
2015 Sep-08  AM 09:08
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| JEFF DANIELS, ) | |
|    Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | CASE NO.: |
| SERRA NISSAN/OLDSMOBILE, Inc., a ) | |
| domestic corporation; ) | |
| SERRA AUTOMOTIVE ) | **PLAINTIFF DEMANDS** |
| MANAGEMENT, INC., a domestic ) | **TRIAL BY STRUCK JURY** |
| corporation; ) | |
| DWIGHT PERRY, an individual; ) | |
| ABDUL ISLAM MUGHAL, an individual; ) | |
| RANDY VISSER, an individual; ) | |
|    Defendants. ) | |

## COMPLAINT

COMES NOW the Plaintiff, JEFF DANIELS, by and through undersigned

counsel, and in support of his claim for relief against Defendants SERRA

NISSAN/OLDSMOBILE, INC., SERRA AUTOMOTIVE MANAGEMENT,

INC., DWIGHT PERRY, ABDUL ISLAM MUGHAL and RANDY VISSER, hereby states the following:

## I.  NATURE OF THE CASE

1.     This is an action for damages, arising under the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. Additionally the action includes claims of fraud, deceit, misrepresentation, negligence, negligent misrepresentation, and conspiracy to commit some or all of the aforementioned torts. All aforementioned acts constitute predatory lending and predatory sales practices and a predatory lending and sales scheme by Defendants.

2.     Defendants form an enterprise in a fraudulent scheme to sell and lease vehicles to residents of Birmingham, and in nearby towns, cities and nearby states, through false and misleading advertising, and intentionally misleading acts and omissions in sales and service.

3.     Defendants take advantage of the consumer customer's sometimes desperate financial position, as well as the customer's unfamiliarity with credit financing practices, to impose very unfavorable lending terms based on false information and, ultimately, cause unsuspecting customers to enter into contracts that they are financially incapable of upholding.

## II. PARTIES

4.    Plaintiff **JEFF DANIELS** (hereinafter referred to as "Plaintiff" or "Mr. Daniels") is an adult citizen and a resident of Jefferson County, Alabama.

5.    Defendant **Serra Nissan/Oldsmobile, Inc.** (hereinafter "Serra") is a for-profit corporation, formed and currently operating in Jefferson County, Alabama, in the business of selling cars to the public.  The principal place of business of Serra Nissan/Oldsmobile, Inc. is 1500 Center Point Road, Birmingham, AL 35215.  The registered agent for Serra Nissan/Oldsmobile, Inc. is Anthony F. Serra, with a registered office street address of 9709 Parkway East, Suite D, Birmingham, AL 35215.

6.    Defendant **Serra Automotive Management, Inc**. is a for-profit corporation, formed and currently operating in Jefferson County, Alabama, in, among other things, the business of sales and service of vehicles to the public.  The principal place of business of Serra Automotive Management, Inc. is Birmingham, Alabama. The registered agent for Serra Automotive Management, Inc. is Anthony F. Serra, with a registered office street address of 9709 Parkway East, Suite D, Birmingham, AL 35215.

7.    Defendant, **Randy Visser**, through information and belief is a resident citizen of Jefferson County, Alabama.   Defendant Visser, was at the time of the transactions made the subject of this complaint, a principal stockholder/owner and

General Manager of Serra Nissan/Oldsmobile, Inc.. Randy Visser is, through information and belief, the son in law of Anthony Serra, the patriarch of the Serra family.  Visser was the General Manager at the time of the wrongdoing and cover up.

8.    Defendant **Dwight Perry**, is, through information and belief, a resident and citizen of Jefferson County, Alabama.  Defendant Dwight Perry was, at the time of the transactions made the subject of this complaint an employee and/or agent of one or more of the Serra Defendants.

9.    Defendant **Abdul Islam Mughal,** is, through information and belief, a resident and citizen of Jefferson County, Alabama.  Defendant Mughal was, at the time of the transactions made the subject of this complaint the General Sales Manager of one or more of the Serra Defendants.

## III. JURISDICTION

10.    This Action is brought pursuant to the provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq. and FCRA, 15 U.S.C. § 1681 *et seq*.  Jurisdiction is conferred on this Court by 28 U.S.C. § 1331, with resulting jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

## IV. VENUE

11.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) in that Plaintiff and Defendants reside or do business in this district and/or a substantial part, if not all, of the events or omissions giving rise to the claim occurred in this district.  Venue is also proper in this district pursuant to 18 U.S.C. § 1965(a) in that all parties reside, are found, have an agent, and/or transact his/her/its affairs in this district.

## V. JURY DEMAND

12.    Plaintiff invokes his right to trial by jury as provided for in 42 U.S.C. § 1981a(c)(1) and Rule 38 of the Federal Rules of Civil Procedure.

## VI. STATEMENT OF FACTS

13.    Serra Nissan/Oldsmobile ("Serra") is located on Centerpoint Parkway in Birmingham, Alabama, and sells new and used cars through both cash sales and vehicle financing.

14.        Serra, while an original creditor on the financed vehicle sales, typically does not remain the creditor, or "tote the note," but sells and assigns the

customer finance contracts to third party banks, such as Capitol One, Santander, or Suntrust.

15.       As part of the sales process, Serra, using identifying, financial and employment information obtained from the customer, typically submits such information via telephone, wire, or internet, to the various third party banks using software dealer management systems, also known as "DMS", such as those provided by DealerTrack Technologies, Inc., and Route One, Inc.  The DMS allows the dealerships to electronically submit the aforementioned customer information to multiple third party banks and financial institutions, in an effort to find a buyer for the customer-financing contract.

16.       After the third party bank agrees to purchase and take assignment of the contract, the funds from the bank are transmitted by wire from the bank to Serra.  Generally, the dealership makes additional profit on the deal by having the customer sign a contract for a higher interest rate than the bank requires to approve its purchase of the financing contract.  This profit, along with the profit made on the sale is paid to the dealership and the various employees, including salesmen and managers, who may receive extra incentives for selling more vehicles, or certain models of vehicles.

17.       Except for providing identification, financial, employment, and other information, the customer has no involvement in the financing process, and is not

made aware of what information is submitted or the possible differences in what financing interest rate the bank will buy versus what Serra represents to the customer is the "best" they can do.

18.      On or about September 17, 2012, Mr. Daniels saw a television advertisement by Serra Nissan in which Serra Nissan offered various cars for sale. Mr. Daniels called Serra Nissan for the purpose of learning more about what vehicles and financing Serra was offering.

19.      Upon calling Serra Nissan, Mr. Daniels spoke with Dwight Perry, a salesman for Serra Nissan.   One of the questions Dwight Perry asked Mr. Daniels was how much he could afford to pay for a car each month.  Mr. Daniels informed Serra's sales personnel that he had a fixed monthly income of approximately $800.00, that he had been disabled since 2011, and received his entire income from Social Security.

20.      Mr. Daniels told Dwight Perry that he wanted to buy a car, but had no way to get to Serra Nissan.  Dwight Perry told Mr. Daniels that he would come get him, and, on or about September 17, 2015, did so, picking up both Mr. Daniels and a friend of Mr. Daniels, and bringing both back to the Serra dealership.

21.     Sometime after arriving back at the Serra dealership, Dwight Perry announced to Mr. Daniels that Mr. Daniels had "A-1" credit and that he could buy a car from Serra.  Mr. Daniels picked out a black Nissan Sentra.

22.      Mr. Daniels, however, did not have a driver's license, due to, among other things, multiple strokes he had suffered in 2010 and 2011, and he informed Dwight Perry of this fact.  Additionally, Mr. Daniels' only has a ninth grade education, cannot read very well, and is unable to read and comprehend anything other than the simplest writings and documents.   Mr. Daniels told Dwight Perry these facts, and Dwight Perry told Mr. Daniels not to worry about it, and took Mr. Daniels to the Alabama Department of Motor Vehicles so Mr. Daniels could obtain a driver's license.   Mr. Daniels did not pass the driving tests, and was only issued an Alabama non-driver photo identification card.  Upon arriving back at the Serra dealership, Dwight Perry took the non-driver photo identification card from Mr. Daniels, and left the room.   Sometime later, Dwight Perry returned with an identification card that was marked as being an Alabama Driver License, and handed same to Mr. Daniels.

23.      Dwight Perry took Mr. Daniels to another Serra employee named "Jeff", explaining that "Jeff" handled the financial part of the sale.  "Jeff" handed Mr. Daniels a pen and instructed him to sign the contracts in the places he indicated if he wanted to purchase the Nissan Sentra he had picked out.  Mr. Daniels signed the contract in reliance on the statements of Dwight Perry and "Jeff" that he had "A-1" credit, had been approved for financing for the purchase, and that the other terms were accurate.

24.       Following Mr. Daniels' purchase of the Sentra, Dwight Perry told Mr. Daniels that he had such good credit that he could also help buy cars for other people, and that if he did so, that Serra Nissan would pay him $100.00 cash for each such person.

25.       Before Mr. Daniels left the dealership that day, Dwight Perry had convinced Mr. Daniels that he should use his good credit to buy a car for Mr. Daniels' friend, Jonnie Gutherie.  Convinced by Dwight Perry that it was the right thing to do, and that he had "A-1" credit, Mr. Daniels co-signed and bought another car, a Dodge van, for Ms. Gutherie.  The payment on this car was about $350.00 per month.

26.    On or about the following day, Mr. Daniels returned to see Dwight Perry with a friend of Mr. Daniels named Richard Hartaway.  Dwight Perry again told Mr. Daniels that his credit was so good that he could buy more cars, and that he could use his good credit to help his friend get a car.  Dwight Perry sold Mr. Daniels and Mr. Hartaway another car, a Nissan Sentra.

27.       Following the sale of the Nissan to Mr. Hartaway, Dwight Perry again told Mr. Daniels that he could buy more cars with his credit and would get $100.00 for doing so, and that Mr. Daniels could use his "A-1" credit to help a Serra employee named "Roland" to buy a car from Serra.   Mr. Daniels agreed to help "Roland" buy a car, and Dwight Perry made the arrangements so that Mr. Daniels,

who was on a fixed social security disability income of approximately $800.00 per month, bought his fourth car in two days.

28.        On or about the next day Mr. Daniels went back to Serra Nissan with his cousin Danny Bennett so that Mr. Daniels could use his "A-1" credit to help yet another person buy a car, and so that Dwight Perry would give him another $100.00.   Within hours, Dwight Perry had arranged for Mr. Daniels to purchase his fifth car of the week.  This purchase, and all of the four prior purchases were executed in the presence of a Serra employee named "Jeff," whom Dwight had introduced as the "finance man."

29.        A few days later, Dwight Perry called up Mr. Daniels and asked Mr. Daniels to help Dwight Perry buy a motorcycle using Mr. Daniels' "A-1" credit. Mr. Daniels agreed to help Dwight Perry, and Dwight took Mr. Daniels to the Harley Davidson store to apply for credit.  Dwight Perry knew someone at the store who was "helping" with the transaction, but for reasons unknown to Mr. Daniels, the purchase did not take place.

30.        Mr. Daniels struggled to make payments on the Sentra to the finance company. Later, Mr. Daniels discovered that Dwight Perry and/or other unknown agents of Serra had falsified his income on the credit applications and that Mr. Daniels did not have the "A-1" credit that Dwight Perry told him he had.  These representations were not true, and not based what Mr. Daniels had stated to Serra

and its agents and employees.

31.     This type of fraudulent activity became so pervasive at Serra Nissan that the Federal Bureau of Investigation raided the dealership in 2013, seizing thousands of documents.

32.     After the Federal Bureau of Investigation raided the Serra Nissan dealership, charges were filed by the United States District Attorney's office and guilty pleas entered against General Managers, Sales Managers, comptrollers, and owners of Serra involving bank and wire fraud, theft of identity and other illegal schemes. Since that time Serra has continued to cover up its own wronging, suppressed the results of its own internal investigation, sought to protect its owners and employees from civil and criminal prosecution, and continues to this day to profit from its own wrongdoing.

33.     Through information and belief, on or about September of 2013, agents for the Federal Bureau of Investigation (hereinafter "FBI") served a search warrant at the location of Serra Nissan Oldsmobile, Inc. and Serra Automotive Management, Inc. in connection with the later federal prosecution of the aforementioned Defendants including ABDUL ISLAM MUGHAL, DWIGHT PERRY and others for bank and wire fraud in violation of 18 U.S.C. 1343.

34.     Since that time, other salesman and managers have plead guilty to criminal acts involving the similar allegations as contained herein.  In said plea agreements

they have admitted that this "fluffing" and "theft of identity" scheme was pervasive throughout the dealership.

35.    Recently, one of the principal owners of Serra Nissan Oldsmobile, Inc., Randy Visser, plead guilty to a federal indictment to similar allegations as alleged herein.

36.    Serra, Dwight Perry, Abdul Islam Mughal, Randy Visser and other agents and/or employees of Serra, including unknown Defendants who have not been named at this time, participated in and conspired together in the aforedescribed conduct to take advantage of and deceive Mr. Daniels into signing at least five contracts for the purchase and financing of vehicles.

## VII. CAUSES OF ACTION

### ALTERNATIVE PLEADINGS:

37.    Plaintiff alleges that the occurrences made the subject of this complaint require that Plaintiff pleads one or more of the following counts, or, in some cases, one or more of the individual claims thereof, in the alternative, where inconsistency arises in their application.

## COUNT I

# VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT

# ORGANIZATIONS ACT 18 U.S.C.§ 1961 et seq. - ALL DEFENDANTS

38.  Plaintiff incorporates by reference the preceding paragraphs and attachments of this Complaint, and alleges that all Defendants, including persons and entities unknown to Plaintiff at this time, conspired to, and engaged in, a predatory lending and sales scheme in an organized effort to sell and lease vehicles to poor and working class residents of Birmingham and cities in nearby states through false and misleading advertising, and intentionally misleading acts and omissions in sales and service.

39.  Defendants, and others, created an advertising scheme using television media, U.S. Mail, and other means, to lure Plaintiff, and others, to the dealership, when, in fact, Defendants and others did not, and did not intend to, honor the promises made in the advertising scheme.

40.  Defendants, and others, falsified information and documents for the Plaintiff, and created false and misleading statements of the Plaintiff's income and financial abilities.

41. Defendants, and others, falsely and fraudulently inflated the income information of Plaintiff submitted to financial institutions so the Plaintiff, who would not otherwise qualify for automobile financing, would show an artificially

high income and be able to obtain financing.

42.  Defendants, and others, directed finance managers and salesmen to submit fraudulent information to financial institutions to misrepresent the Plaintiff's income and ability to pay for vehicle financing.

43.  Defendants, and others, defrauded financial institutions by making it appear that the Plaintiff qualified for automobile financing, when in fact Plaintiff would not otherwise qualify.

44.  Defendants' ultimate scheme is intended to sell a vehicle, and reap financial benefits, regardless of the buyer's ability to make payments on the financing contract, or the assignee-banks ability to collect against the falsified income.

45.  All Defendants used wire, radio, or television communication in interstate or foreign commerce, as well as writings, signs, signals pictures, or sounds in furtherance of their actions as set forth above, and all Defendants engaged in a pattern of racketeering activity as defined in 18 U.S.C. §§ 1961-1968.

46.  Defendants, all of which are persons within the meaning of RICO, are employed by or associated with an enterprise whose activities engage in or affect interstate commerce and conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C.§ 1962(c); to wit, multiple violations of 18 U.S.C. §§ 1341, 1343, 1344.

47. The members of the group have the same or similar purposes, results, participants, victims, methods of commission, and are interrelated by distinguishing characteristics and are not isolated events.

48. All Defendants violated 18 U.S.C. § 1341 multiple times, having devised or intended to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises transmitted or caused to be transmitted by means of the United States Postal Service, for the purpose of executing such scheme or artifice.

49. The multiple violations of 18 U.S.C. §1341 constitute racketeering activity pursuant to 18 U.S.C. § 1961 and were integral part of and essential to the success of the Predatory Lending and Sales Scheme.

50. All Defendants violated 18 U.S.C. § 1343 multiple times, having devised or intended to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds, for the purpose of executing such scheme or artifice.

51. The multiple violations of 18 U.S.C. §1343 constitute racketeering activity pursuant to 18 U.S.C. § 1961 and were integral part of and essential to the success of the Predatory Lending and Sales Scheme.

52.  All Defendants violated 18 U.S.C. § 1344 multiple times, having devised or intended to devise a scheme or artifice to defraud a financial institution, or for obtaining money or property from a financial institution, by means of false or fraudulent pretenses, representations, or promises transmitted or caused to be transmitted by Defendants, and others, for the purpose of executing such scheme or artifice.

53.  The multiple violations of 18 U.S.C. §1344 constitute racketeering activity pursuant to 18 U.S.C. § 1961 and were integral part of and essential to the success of the Predatory Lending and Sales Scheme.

54.  All Defendants knew the Predatory Lending and Sales Scheme could not have succeeded and/or continued without the use of extensive advertisements through wire, internet, radio, television, and pictures in interstate or foreign commerce for the purpose of transmitting misleading and fraudulent information to prospective customers such as Plaintiff.

55.  The facts demonstrate that Defendants formed an association-in-fact.

56.  The associated persons formed an ongoing organization, formal or informal, concerning the RICO Enterprise, and the various associates functioned as a continuing unit of the RICO Enterprise, and the RICO Enterprise exists separate and apart from the predicate activities themselves. The facts in the case demonstrate the existence of an association-in-fact RICO Enterprise by showing

that the enterprise has a certain amount of organizational structure or some sort of chain of command.

57.  Defendants Dwight Perry, Abdul Islam Mughal, Randy Visser, and others, acting as agents for Serra are at the heart of the RICO Enterprise. Their role as facilitators is crucial to the success of the enterprise. The scheme begins with television, radio and internet advertising for Serra that is targeted at unsophisticated, poor, uneducated, mentally ill, and working class residents of the Birmingham and surrounding areas, including Tennessee, Georgia and Mississippi.

58.  When the customers arrive at Serra, they are greeted by a salesperson.  The first thing that the salesman asks the customer is either how much of a monthly payment the customer can afford, or how much of a down payment can he or she make that day. The salesman then brings the customer further back in the lot to a vast selection of cars.

59.  Sometimes a customer picks out a car, and sometimes the salesman will tell the customer what he or she can afford to pay for, based on the customer's income. The salesman may then tell the customer that he or she must make a down payment in a certain amount. Whether or not the customer and salesman agree on a down payment, the salesperson will direct the customer to an office within the dealership where the customer waits while the salesman works to obtain what the dealership refers to as "financing" for the customer.

60.  Because Serra does not typically hold the credit contract for the vehicles it finances as part of the sale or lease, Serra depends on third-party banks to buy the financing contract.  These banks will only buy the contract if the debtor, such as Plaintiff herein, meets the bank's criteria for such credit, which is based, in no small part, on the debtor's ability to make all of the payments under the credit contract.

61.  If the customer would not otherwise qualify for financing, the RICO Enterprise would fraudulently inflate the customer's income information so customers would show an artificially high income and would qualify for financing.

62.  If the third-party banks/financial institutions required proof of income, residency or other proof of the ability to pay the financing contract, the RICO Enterprise would create false documents, or alter existing documents, and submit such documents to the financial institutions.  Such information caused wire, telephone and electronic communications to the made across state lines.

63.  Within the RICO Enterprise, there was a scheme, known by Defendants herein, and others, that if a customer did not qualify for financing, the RICO Enterprise would falsify information or documents that would ensure the customer was funded.

64.  In the case of the Plaintiff, Mr. Daniels, the RICO Enterprise was able to "qualify" him for financing, **despite** the fact that the monthly financing contract

payments totaled much more than the $ 800.00 he received from Social Security disability payments.

65. Once the dealership finds a bank that will purchase a proposed credit contract/lease sale under terms that are sufficient for the RICO enterprise to make a substantial profit, the salesman will then often hand over the customer to a person to sign the paperwork or complete the finance and/or lease of the vehicle.

66. The finance person often quotes a payment for the car that is different, and higher, than the amount the customer believed he or she had negotiated with the salesman. The finance person will then use one of several techniques to distract the customer as they sign a stack of pre-filled out sales related contracts, so the customer overlooks the high interest rate, actual down payment, total price, and the Truth in Lending boxes in general. The finance person will instead draw the customer's attention to the due date for the payments, discuss features of the new car, or otherwise distract the customer, without fully explaining the actual payments due under the contract or its terms, if any explanation is given at all.

67. After the customer signs the paperwork, and the third-party bank has purchased and been assigned the financing/lease contract, the RICO Enterprise of the Serra Nissan and Serra Automotive Management defendants, Dwight Perry, Adbul Islam Mughal, Randy Visser, as well as other agents of the Serra defendants, have already made a substantial profit on the vehicle sold or leased to

the customer.  Whether or not the customer makes all of their payments to the third party bank under the terms of the sale/lease contract is of no concern to the Defendants, because the RICO Enterprise has moved another car off its lot and received payment for the commercial paper from the third-party bank.

68.  The RICO Enterprise exists by use of advertising to lure customer into the dealership.   Once the customer is at the dealership, the RICO Enterprise fraudulently alters and/or misrepresents the customer's financial ability, including their income, for the purposes of inducing third party banks to take assignment of credit financing sale/lease contracts with the customer.  Not only are the banks tricked into taking assignment of a contract that the RICO Enterprise knows will likely be defaulted on, but the customer themselves are tricked into believing that they are financially able to make payments under the financing contract. Furthermore, the customer is led to believe that the bank has investigated the income and credit history on the customer's behalf and that "qualification for credit" means the customer has the financial means to pay.

69. Over the past years the RICO Enterprise, acting in concert, performed numerous overt acts to further the purposes of the Enterprise.  Because many of these acts were concealed, plaintiff is not able to state all overt acts, but alleges the following as an example:

**(A)   Abdul Islam Mughal, former General Sales Manager at Serra Nissan/Oldsmobile, Inc.,** one of the members of the enterprise named herein, was indicted in the United States District Court for the Northern District of Alabama, for conspiracy to commit wire fraud in violation of Title 18, United States Code, § 1343.  **See** Exhibit "A", "Plea agreement of Abdul Islam Mughal."  In furtherance of the conspiracy, Mr. Mughal, and others:

a) falsified information and documents for customers, such as Plaintiff herein that did not qualify for vehicle financing to ensure the vehicle financing was funded;

b) falsified and fraudulently inflated the income information of prospective car purchasers submitted to financial institutions so customers, such as Plaintiff herein, that would otherwise not qualify for vehicle financing, would show an artificially high income and would be able to obtain vehicle financing;

c) created false documents or materially altered existing documents to be submitted to financial institutions to show that customers were making more than their actual income;

d) would profit financially through increased sales and additional commissions.

**(B)    Dwight Perry, Serra Nissan Salesman and Defendant herein**, is a member of the RICO Enterprise, and entered into a plea agreement regarding the RICO Enterprise's conduct described herein in the case of *United States of America v. Dwight Perry*, case no.: 2:14-CR-00300-VEH-SGC.  **See** Exhibit "B", "Plea agreement of Dwight Perry."  As part of his plea agreement stipulated to the following facts:

"The defendant, Dwight A. Perry, worked for Serra Nissan twice during his sixteen years as a car salesman. Most recently, Perry worked as a salesman at Serra Nissan from 2010 until October 2013. Serra Nissan is located at 1500 Center Point Parkway, Birmingham, Alabama 35215, in the Northern District of Alabama. As a salesman, Perry was responsible for selling cars to customers who came in to the dealership, and he also contacted customers over the phone to invite them to come to the dealership to purchase a car."

"Serra Nissan sells new and used cars and often assists customers with obtaining car loans. As part of the car loan funding process, Serra Nissan

collects personal information from prospective customers, including, but not limited to, customers' social security numbers, credit scores, monthly income, pay stubs, current home addresses, personal references, and other information required by financial institutions in order to fund car loans. "

"Some of that information is gathered at the time the customer enters the dealership and speaks to a salesman, while more detailed information is collected at the final signing or financing, conducted by a finance manager. The entire process is overseen by the General Sales Manager (GSM) and/or a sales manager."

"Once the customer is approved for a loan, the Sales Manager prints the "buyer's order" and gives the information to the salesman. The buyer's order lists how much the customer is required to put down on the car, how much the car loan will be, and how much the trade-in value will be, if there is a trade-in. The salesman and/or sales manager is then responsible for getting the customer to agree on a price in order for there to be a sale."

"There was a pervasive scheme throughout Serra Nissan, known among many of the salesman, finance managers, sales managers, and other Serra

Nissan employees, that if a customer did not qualify for a car loan for some reason, the salesman, finance managers, sales managers, or GSM were to falsify information or documents that would ensure the customer was funded. Perry directly participated in several aspects of the scheme to defraud financial institutions including, but not limited to:"

"1) Others, with Perry's knowledge and consent, would fraudulently inflate the income information of prospective car purchasers submitted to financial institutions so customers that would otherwise not qualify for car loan funding, would show an artificially high income and would be able to obtain a loan. This process was sometimes called "fluffing" a customer's income. Perry would then call customers and tell them that, if the lender called to confirm the amount of income stated on the loan application, the customer was to confirm they made the inflated amount."

"2) Where financial institutions required a stipulation as to proof of income, Perry knew others were creating false documents, or altering existing documents, and were submitting them to the financial institution making the loan. This process caused wire communications to be made across state

lines. Perry was aware that sales he was profiting from involved the submission of false documents."

"3) Where a financial institution required a stipulation as to proof of residency, Perry was aware that fraudulent utility bills were submitted to the financial institution making the loan. Others, with Perry's knowledge and consent, also falsified credit applications to show two individuals lived together when in fact, they did not, so that financial institutions would believe there was a combined income greater than what actually existed for the individual customer."

"4) Perry and others would also defraud lending financial institutions by making it appear that an individual who qualified for the loan, often referred to as a "straw buyer," purchased the vehicle when in truth and fact, the actual purchaser would not otherwise qualify because they had poor credit, insufficient income, no proof of residency, etc. On at least one occasion, Perry told a customer that, if the bank called to ask about who, in fact, owned the car, the customer was to tell the bank the customer owned it, even though Perry knew the customer had purchased it

for someone else."

"Between September 17, 2012, and October 11, 2012, Serra Nissan sold, or attempted to sell, five vehicles to a customer named J.D. Initially, J.D. called Serra Nissan and spoke with Perry about purchasing a vehicle. Because J.D. did not have a vehicle, Perry picked J.D. and his girlfriend up from J.D. 's apartment, and brought them to Serra Nissan. When they arrived at Serra Nissan, Perry input J.D. 's name, address, date of birth, social security number, income, and other information, into ProMax, a dealer management software program Serra Nissan used at that time. Once J.D. 's information was put into ProMax, J.D. 's credit application would have been given to the Sales Manager. "

"Because J.D. was on disability, J.D. only made about $796 per month. However, J.D. 's credit score was good enough that J.D. could qualify to purchase multiple cars, if the dealership could show that J.D. made enough money. Perry was aware that a sales manager increased J.D. 's income in DealerTrack so that J.D. would qualify for a car loan."

"The sales manager told Perry after entering the information into Dealertrack, that J.D. 's income had been inflated, and how much it had been increased. The sales manager provided that information so that Perry could

inform J.D. that, if the lender called J.D. to confirm his income after the purchase, J.D. would know to tell the lender the inflated income amount."

"The first car J.D. purchased was a Nissan Sentra that J.D. purchased for himself on or about September 24, 2012. However, because of J.D.'s good credit, J.D. was pre-approved by multiple lenders for a car loan. As a result, Perry sold J.D. additional cars. The second car J.D. purchased was for his girlfriend and the third car J.D. purchased was for his cousin. Perry told J.D. that Serra Nissan would give him approximately $100 for each car he bought. Perry was aware that each vehicle J.D. purchased for someone else was a straw purchase."

"For the third car purchase, J.D. was required by the lender to have a valid driver's license. Because J.D. only had an identification card, Perry took a copy of the identification card to T.W.H., another salesman at Serra Nissan who was known to produce driver's licenses when needed. After he created it, T.W.H. showed Perry the copy of a false driver's license he had made for J.D. T.W.H. charged $50 for false identifications, such as copies of falsified driver's licenses."

"For the fourth car purchase, another salesman at Serra Nissan, R.W.R., found out what Perry was doing with J.D. R.W.R. asked if Perry could get J.D. to buy him a car as well. Perry asked J.D. to purchase another car for R.W.R., and J.D. agreed to do it. J.D. signed the loan documents, prepared by finance manager M.J.W., though the car was a straw purchase for R.W.R."

"The fifth car J.D. purchased was also a straw purchase for someone else."

"Because four of the five vehicles were straw purchases for other people, Perry and the finance manager would have had a conversation with J.D. to tell him that if the lender called and asked questions, J.D. needed to tell the lender the vehicle was for him and not anyone else. M.J.W. was the finance manager on all five sales involving J.D., Perry and others, including Serra Nissan salesmen, general managers, GSM, sales managers, and finance managers, did willfully conspire and combine to submit materially false information to financial institutions, with the intent to defraud them for personal financial gain.  Perry and others did also willfully conspire and combine to knowingly participate in a scheme to defraud financial institutions, non-bank: lenders, and captive auto finance companies, whereby

they willfully submitted materially false information, with the specific intent to defraud the lenders, which caused wire communications to be transmitted in interstate commerce to help carry out the scheme to defraud."

*See* *United States of America v. Dwight Perry*, case no.: 2:14-CR-00300-VEH-SGC, United States District Court for the Northern District of Alabama, Southern Division (plea agreement entered February 3, 2015).

70.  By reason of the aforesaid violations of the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c), Defendants are liable to Plaintiff for actual and treble damages, as well as for costs and attorney's fees.

## COUNT TWO:

## WILLFULNESS, WANTONESS, NEGLIGENCE and/or RECKLESSNESS

## - ALL DEFENDANTS -

71.  Plaintiff hereby incorporates and adopts each of the above and foregoing allegations, exhibits, and material averments as if fully set forth herein.

72.     Defendants owed Plaintiff a duty not to be wanton, negligent and/or reckless in its/his/her conduct toward Plaintiff, including, but not limited to, the following conduct:

      a.  Making material misrepresentations to third parties regarding Plaintiff's financial abilities, knowing that Plaintiff would be harmed by the third parties' reliance on such misrepresentations.

      b.  Obtaining Plaintiff's consumer credit report based on false representations to third party banks;

      c.  Obtaining Plaintiff's consumer credit report without Plaintiff's authorization.

      d.  Other conduct inconsistent with Defendant's obligations and duties under the contract, federal and state law.

73.     Defendants were willful, wanton, negligent and/or reckless in its use of Plaintiff's personal information, including intentionally and knowingly false, misleading and deceptive information regarding the Plaintiff, to facilitate the lease/sale of a vehicle to Plaintiff, to facilitate the lease/sale of the Plaintiff's financing contract to third party banks and to maximize its own profit.

74.     Defendants were willful, wanton, negligent and/or reckless in its conduct as to the Plaintiff in that Defendant caused Plaintiff's consumer credit report to contain inquiries and information that damaged Plaintiff.

75.    Defendants' failure to comply with the FCRA when it requested, obtained and used the Plaintiff's consumer credit report was negligent, as contemplated under 15 U.S.C. § 1681o of the FCRA.  As a result of said conduct by Defendants, Plaintiff has been damaged.

76.    In the alternative, Defendants' failure to comply with the FCRA when it requested, obtained and used the Plaintiff's consumer credit report was willful, as contemplated under 15 U.S.C. § 1681n of the FCRA.  As a result of said conduct by Defendants, Plaintiff has been damaged.

77.    In the alternative, Defendants' request for, acquisition of and use of the Plaintiff's consumer credit report constituted the knowing and willful receipt of information on a "consumer" (as said term is defined under the FCRA) under false pretenses, as contemplated under 15 U.S.C. § 1681n and § 1681q of the FCRA.  As a result of said conduct by Defendants, Plaintiff has been damaged.

78.    By its conduct, the Defendants breached said duties to the Plaintiff and was wanton and/or negligent.

79.    As a proximate result, the Plaintiff were caused to suffer loss of monies, incidental and consequential damages, as well as severe mental anguish and emotional distress.


**COUNT THREE:**

## NEGLIGENT TRAINING, SUPERVISION AND RETENTION

### - ALL DEFENDANTS -

80.     Plaintiff repeats each and every allegation and exhibit contained in the paragraphs above and below and incorporates such allegations by reference.

81.     Defendants owed Plaintiff a duty of care and professionalism in the rendition of the services rendered and products sold to plaintiff and third parties, in training and supervising its employees to perform those services in full compliance with the laws of the State of Alabama and the Federal Government, in not engaging or allowing its agents to engage in the wrongful practices herein alleged, in not suppressing or concealing such activities, or enabling its agents to do so, and in not terminating or otherwise disciplining those employees or agents known to have violated company policies, state and federal laws or regulations by engaging in the misconduct herein alleged.

82.     Defendants owed duties to Plaintiff in putting forth loyal, honest, and fair dealing employees or agents who act in compliance with Federal and State laws regarding the sale, titling and financing of vehicles, as well as the proper methods utilized for credit inquiry and Defendants' superior knowledge of those respective industries, its practices, and Defendants' practices.   Defendants' negligent retention of employees known to have engaged in the misconduct described herein acted as ratification of such misconduct.  The Defendants each,

and working collectively, or as agents, breached the duties they owed to Plaintiff, and such breaches arise out of the negligent or wanton conduct of the Defendants and those who acted in concert or conspiracy with them or acted as their agents, servants or employees, and in the line and scope of their business and contractual and statutory and regulatory duties, in order to preserve and protect the financial interest of the Defendants and those who acted in concert or conspiracy with them.

83.     Defendants knew, or should have known, of the wrongful or fraudulent practices engaged in by its employees or agents, and knew or should have known that its own training, supervision and retention practices were inadequate to fulfill its obligation to protect the public and the Plaintiff. Defendants knew, or should have known, that its policies and practices in training, supervising, and retaining such employees were inadequate to prevent or detect the misconduct described herein, and such inadequate policies and practices were the actual and proximate cause of Plaintiff's injuries.

84.     Plaintiff has incurred damages proximately caused by Defendants' negligence in training, supervising, and retaining its employees and/or agents.

85.     By its conduct the Defendants breached said duties to Plaintiff and were wanton, negligent and/or reckless.

86.       As a proximate result of the aforementioned conduct of Defendants, Plaintiff was caused to suffer loss of monies, incidental and consequential damages, as well as severe mental anguish and emotional distress.

## COUNT FOUR:

## FRAUD, DECEIT, SUPPRESSION AND MISREPRESENTATION

## - ALL DEFENDANTS -

87.       Plaintiff hereby incorporates and adopts each of the above and foregoing allegations as if fully set forth herein.

88.       On or about September, 2012, Defendants made one or more of the following misrepresentations to third party banks and financing institutions, for the purpose of illegally obtaining an agreement to provide financing:

a.       Plaintiffs had presently agreed to be an obligor or co-obligor on at least five automobile financing contracts;

b.       Plaintiff were presently involved in a credit transaction with Serra;

d.       Plaintiffs had presently provided authorization for Serra to obtain Plaintiffs' credit report;

e.       Defendants had a permissible purpose under the Fair Credit Reporting Act to obtain Plaintiffs' credit report;

f.      Plaintiff had provided employment and financial information to Defendants;

e.          Plaintiff had been approved for vehicle financing based on his actual income;

f.          Defendants were using Plaintiff's actual indentifying, financial and employment information to obtain vehicle financing for Plaintiffs.

89.      On or about September, 2012, the Defendants made the following misrepresentations of material facts to the Plaintiff upon which he reasonably relied:

    a. That the Plaintiff qualified for credit financing with his current credit history and current social security income of $800.00 per month.

    b. That the Plaintiff had "A-1" credit.

    c. That the Plaintiff was "approved" for credit.

    d. That defendant would accurately and truthfully transmit the plaintiff's responses and answers in the credit application to third party lenders.

    e. That because of the Plaintiff's good credit rating that he qualified to be an additional obligor or co-obligor on automobiles purchased for other people.

    f. That these type of transactions were perfectly legal in all aspects and above board.

90.      Defendants made such representations in order to increase its profit on the sale and lease of its vehicles and increase its/his/hers financial gain.

91.      Based on such representation by Defendants, third party banks made inquiries with one or more Credit Reporting Agencies, thereby causing such inquiries to become part of Plaintiff's credit history.

92.      The aforementioned representations by Defendants were false.   The Defendants either (1) knew such representations were false and intentionally made them; or (2) recklessly made said representations without knowledge of truth or falsity; or (3) innocently or negligently misrepresented said facts causing Plaintiffs and others to reasonably rely upon them.

93.      On or about September 17, 2012, Defendants had a duty to correctly and accurately disclose to the Plaintiff, and to any third party lenders, banks or finance companies, the plaintiff's actual financial and/or credit condition. Defendants had a further duty to accurately communicate Plaintiff's responses to their credit questions and Plaintiffs qualification for credit financing.   By their conduct, the Defendants hid and suppressed the actual financial terms the Plaintiff was entering into.  Under the Defendant's pervasive scheme it was the Defendants' pattern and practice that Defendants and their salesmen, finance managers, sales managers, general sales managers, and/or agents and employees would falsify information or documents that would ensure that credit agreement would be

purchased by a third party bank or lender.  In the case of the Plaintiff, Defendants suppressed that:

    a.   Defendants had fraudulently inflated plaintiff's income on the credit application.

    b.   Defendants created false documents or altered existing documents submitted to financial institutions to ensure the purchase of the commercial paper.

    c.   That under Plaintiff's actual credit score and income that the Plaintiff would not qualify for financing.

    d.   That Plaintiff had, or would be, denied credit under his actual income and credit score.

    e.   That the Plaintiff could read and write and could and did understand the nature of the transactions entered into.

    f.   That said activity was illegal, immoral and unethical.

94.       As a proximate result of said conduct, the Plaintiff was caused to suffer loss of monies, loss of credit standing, incidental and consequential damages, severe mental anguish and emotional distress as well as additional costs of this proceeding and attorney's fees.

**COUNT FIVE:**

## VIOLATION OF THE FAIR CREDIT REPORTING ACT, 15 U.S.C. § 1681

## *et seq*: NEGLIGENT FAILURE TO COMPLY WITH THE FCRA

## - ALL DEFENDANTS -

95.     Plaintiff is a "consumer" as defined by § 1681a(c) of the FCRA.

96.     Defendants are both a "person" and a "user" of consumer credit and other financial information, as said terms are defined and contemplated respectively, under the FCRA.

97.     Defendants obtained a copy of Plaintiff's consumer credit report from a credit reporting agency.

98.     Plaintiff's authorization to Defendants to obtain consumer credit reports, if given at all, was given to Defendants only in contemplation of Defendants using Plaintiff's actual personal, financial and employment information, not falsified information or falsified documents.

99.     Defendants obtained a consumer credit report on the Plaintiff without authorization, under false pretenses and without a permissible purpose on each and every occasion that a third party bank or financing company provided Defendants with a decision regarding financing for Plaintiff.

100.    At all relevant times, Defendants, employees and agents of Defendants, engaged by Defendants for the purpose of office administration and/or tasks related to Defendants' business, had access to computer hardware and software allowing

them to, among other things, request and obtain consumer credit and other financial information on behalf of or for the benefit of Defendants through electronic, telephone, wire and other means.

101.   On or around September 2012, Defendants requested, obtained, and used Plaintiff consumer credit report from third party banks and third party banks provided (by wire, electronic means, computer or otherwise) Plaintiff's consumer credit report to Defendant on approximately 16 occasions.

102. Defendants, and its employees and agents, by submitting intentionally and knowingly falsified information regarding the Plaintiff, did not have Plaintiff's authorization to obtain such credit reports, and therefore Defendants' request, acquisition and use of Plaintiff's consumer credit report was in violation of the FCRA.

103.   Defendants negligently failed to comply with the FCRA when it used credit reports on the Plaintiff obtained from the Finance Companies without authorization.

104.   Pursuant to 15 U.S.C. § 1681o, any person who is negligent in failing to comply with any requirement imposed under the FCRA with respect to any consumer is liable to that consumer in an amount equal to the sum of (i) any actual damages sustained by the consumer as a result of the failure and (ii) in the case of

any successful action to enforce any liability under 15 U.S.C. § 1681o, the costs of the action together with reasonable attorneys' fees.

105. As the proximate result of the aforementioned conduct of the Defendants, Plaintiff's access to credit has been compromised, and continues to be compromised, by imparting to past, present and future credit grantors, that Plaintiff authorized applications for credit on the multiple occasions made the subject of this complaint, resulting in actual damages through increased costs of credit or declined credit, as well as other costs incurred by Plaintiff.

106. As a result of Defendants' negligent failure to comply with the FCRA, defendants are liable to the Plaintiff in an amount equal to the sum of (i) any actual damages sustained by the Plaintiff as a result of said failure and (ii) the costs of this action together with reasonable attorneys' fees.

## COUNT SIX:

## WILLFUL FAILURE TO COMPLY WITH REQUIREMENTS OF FCRA

### - ALL DEFENDANTS -

107. Plaintiff hereby incorporates and adopts each of the above and foregoing allegations and material averments as if fully set forth herein.

108. Defendants willfully failed to comply with the FCRA when it obtained credit reports on the Plaintiff from the Finance Companies without authorization, under false pretenses, or knowingly, without a permissible purpose.

109. Defendants willfully failed to comply with the FCRA when it used credit reports on the Plaintiff obtained from the Finance Companies, without authorization, under false pretenses, or knowingly, without a permissible purpose.

110. Pursuant to 15 U.S.C. § 1681n, any person who willfully fails to comply with any requirement imposed under the FCRA with respect to any consumer is liable to that consumer in an amount equal to the sum of  (i) any actual damages sustained by the consumer as a result of the failure or damages or not less than $100.00 and not more than $1,000.00; (ii) such amount of punitive damages as the court may allow; and (iii) in the case of any successful action to enforce any liability under 15 U.S.C. § 1681n, the costs of the action together with reasonable attorneys' fees.

111. As a result of defendants' willful failure to comply with the FCRA, defendants are liable to the Plaintiff in an amount equal to the sum of (i) any actual damages sustained by the Plaintiff as a result of the failure or damages of not less than $100.00 and not more than $1,000.00 for each such violation; (ii) such amount of punitive damages as the court may allow; and (iii) the costs of this action together with reasonable attorneys' fees.

**COUNT SEVEN:**

## CONSPIRACY - ALL DEFENDANTS -

112.   Plaintiff re-alleges the allegations set forth in the foregoing paragraphs and attached exhibits as if the same were set forth herein verbatim.

113.   The following persons and parties participated in a civil conspiracy to commit fraud by commission and by omission, the purposes of which are detailed below:

        a) Serra Nissan/Oldsmobile, Inc.;

        b) Serra Automotive Management;

        c) Dwight Perry;

        d) Abdul Islam Mughal;

        e) Randy Visser;

        f) Other unknown co-conspirators.

114.   The civil conspiracy existed at all times material to this lawsuit, and is believed to continue to exist at the present time. The primary goal of the conspiracy was to profit through the sale of vehicles to consumers with low-income or poor credit by misrepresenting the consumer's income and finances to third party banks who would, in reliance on the misrepresentation, extend credit to the consumer.

115.   More specifically, the purposes of the conspiracy were:

a. To purposefully create an illusion in the consumer that the consumer was financially capable of meeting the terms of a credit financing contract;

b. To knowingly and intentionally lie to, deceive and improperly influence third party banks to extend financing to the consumer by misrepresenting the consumer's income and financial capabilities to the third party bank;

c. To enter into as the original creditor, contracts with the consumer for the financing of vehicles;

d. To sell and/or assign said financing contracts to third party banks with the knowledge that the consumer could not conform to the terms of the contract, and would ultimately default, thereby causing the consumer to, inter alia, have the vehicle repossessed, incur damage to their credit, and be subject to collection efforts by the third party bank assignee.

e. To profit from the aforedescribed scheme through the sale of vehicles, sales based incentives from manufactures and third party banks, and other means.

116.   The conspirators agreed to carry out the purpose of the conspiracy listed above, and as set forth in the factual allegations stipulated to by Mr. Mughal in the above referenced federal court matter. The conspirators participated in and cooperated with each other in the conspiracy. Each act of the conspiracy was

ratified by other co-conspirators, who acted as each other's agents, and still continue to do so.

117.   Over the past years the conspirators, acting in concert, performed numerous overt acts to further the purposes of the conspiracy.  Because many of these acts were concealed, plaintiff is not able to state all overt acts, but alleges the following as an example:

**Abdul Islam Mughal, former General Sales Manager at Serra Nissan/Oldsmobile, Inc.**, one of the co-conspirators named herein, was indicted in the United States District Court for the Northern District of Alabama, for conspiracy to commit wire fraud in violation of Title 18, United States Code, § 1343.  In furtherance of the conspiracy, Mr. Mughal, and others:

a) falsified information and documents for customers, such as Plaintiff herein that did not qualify for vehicle financing to ensure the vehicle financing was funded;

b) falsified and fraudulently inflated the income information of prospective car purchasers submitted to financial institutions so customers, such as Plaintiff herein, that would otherwise not qualify for

vehicle financing, would show an artificially high income and would be able to obtain vehicle financing;

c) created false documents or materially altered existing documents to be submitted to financial institutions to show that customers were making more than their actual income;

d) would profit financially through increased sales and additional commissions.

**Dwight Perry, Defendant herein**, entered into a plea agreement in the case of *United States of America v. Dwight Perry*, case no.: 2:14-CR-00300-VEH-SGC, and as part of his plea agreement stipulated to the following facts:

"The defendant, Dwight A. Perry, worked for Serra Nissan twice during his sixteen years as a car salesman. Most recently, Perry worked as a salesman at Serra Nissan from 2010 until October 2013. Serra Nissan is located at 1500 Center Point Parkway, Birmingham, Alabama 35215, in the Northern District of Alabama. As a salesman, Perry was responsible for selling cars to

customers who came in to the dealership, and he also contacted customers over the phone to invite them to come to the dealership to purchase a car."

"Serra Nissan sells new and used cars and often assists customers with obtaining car loans. As part of the car loan funding process, Serra Nissan collects personal information from prospective customers, including, but not limited to, customers' social security numbers, credit scores, monthly income, pay stubs, current home addresses, personal references, and other information required by financial institutions in order to fund car loans. "

"Some of that information is gathered at the time the customer enters the dealership and speaks to a salesman, while more detailed information is collected at the final signing or financing, conducted by a finance manager. The entire process is overseen by the General Sales Manager (GSM) and/or a sales manager."

"Once the customer is approved for a loan, the Sales Manager prints the "buyer's order" and gives the information to the salesman. The buyer's order lists how much the customer is required to put down on the car, how much the car loan will be, and how much the trade-in value will be, if there is a

trade-in. The salesman and/or sales manager is then responsible for getting the customer to agree on a price in order for there to be a sale."

"There was a pervasive scheme throughout Serra Nissan, known among many of the salesman, finance managers, sales managers, and other Serra Nissan employees, that if a customer did not qualify for a car loan for some reason, the salesman, finance managers, sales managers, or GSM were to falsify information or documents that would ensure the customer was funded. Perry directly participated in several aspects of the scheme to defraud financial institutions including, but not limited to:"

"1) Others, with Perry's knowledge and consent, would fraudulently inflate the income information of prospective car purchasers submitted to financial institutions so customers that would otherwise not qualify for car loan funding, would show an artificially high income and would be able to obtain a loan. This process was sometimes called "fluffing" a customer's income. Perry would then call customers and tell them that, if the lender called to confirm the amount of income stated on the loan application, the customer was to confirm they made the inflated amount."

"2) Where financial institutions required a stipulation as to proof of income, Perry knew others were creating false documents, or altering existing documents, and were submitting them to the financial institution making the loan. This process caused wire communications to be made across state lines. Perry was aware that sales he was profiting from involved the submission of false documents."

"3) Where a financial institution required a stipulation as to proof of residency, Perry was aware that fraudulent utility bills were submitted to the financial institution making the loan. Others, with Perry's knowledge and consent, also falsified credit applications to show two individuals lived together when in fact, they did not, so that financial institutions would believe there was a combined income greater than what actually existed for the individual customer."

"4) Perry and others would also defraud lending financial institutions by making it appear that an individual who qualified for the loan, often referred to as a "straw buyer," purchased the vehicle when in truth and fact, the actual purchaser would not otherwise qualify because they had poor credit, insufficient income, no proof of residency, etc. On at least one occasion, Perry told a customer that, if the bank called to ask about who, in fact,

owned the car, the customer was to tell the bank the customer owned it, even

though Perry knew the customer had purchased it

for someone else."

"Between September 17, 2012, and October 11, 2012, Serra Nissan sold, or

attempted to sell, five vehicles to a customer named J.D. Initially, J.D. called

Serra Nissan and spoke with Perry about purchasing a vehicle. Because J.D.

did not have a vehicle, Perry picked J.D. and his girlfriend up from J.D. 's

apartment, and brought them to Serra Nissan. When they arrived at Serra

Nissan, Perry input J.D. 's name, address, date of birth, social security

number, income, and other information, into ProMax, a dealer management

software program Serra Nissan used at that time. Once J.D. 's information

was put into ProMax, J.D. 's credit application would have been given to the

Sales Manager. "

"Because J.D. was on disability, J.D. only made about $796 per month.

However, J.D. 's credit score was good enough that J.D. could qualify to

purchase multiple cars, if the dealership could show that J.D. made enough

money. Perry was aware that a sales manager increased J.D. 's income in

DealerTrack so that J.D. would qualify for a car loan."

"The sales manager told Perry after entering the information into Dealertrack, that J.D. 's income had been inflated, and how much it had been increased. The sales manager provided that information so that Perry could inform J.D. that, if the lender called J.D. to confirm his income after the purchase, J.D. would know to tell the lender the inflated income amount."

"The first car J.D. purchased was a Nissan Sentra that J.D. purchased for himself on or about September 24, 2012. However, because of J.D.'s good credit, J.D. was pre-approved by multiple lenders for a car loan. As a result, Perry sold J.D. additional cars. The second car J.D. purchased was for his girlfriend and the third car J.D. purchased was for his cousin. Perry told J.D. that Serra Nissan would give him approximately $100 for each car he bought. Perry was aware that each vehicle J.D. purchased for someone else was a straw purchase."

"For the third car purchase, J.D. was required by the lender to have a valid driver's license. Because J.D. only had an identification card, Perry took a copy of the identification card to T.W.H., another salesman at Serra Nissan who was known to produce driver's licenses when needed. After he created

it, T.W.H. showed Perry the copy of a false driver's license he had made for

J.D. T.W.H. charged $50 for false identifications, such as copies of falsified

driver's licenses."


"For the fourth car purchase, another salesman at Serra Nissan, R.W.R.,

found out what Perry was doing with J.D. R.W.R. asked if Perry could get

J.D. to buy him a car as well. Perry asked J.D. to purchase another car for

R.W.R., and J.D. agreed to do it. J.D. signed the loan documents, prepared

by finance manager M.J.W., though the car was a straw purchase for

R.W.R."


"The fifth car J.D. purchased was also a straw purchase for someone else."


"Because four of the five vehicles were straw purchases for other people,

Perry and the finance manager would have had a conversation with J.D. to

tell him that if the lender called and asked questions, J.D. needed to tell the

lender the vehicle was for him and not anyone else. M.J.W. was the finance

manager on all five sales involving J.D., Perry and others, including Serra

Nissan salesmen, general managers, GSM, sales managers, and finance

managers, did willfully conspire and combine to submit materially false

information to financial institutions, with the intent to defraud them for personal financial gain.  Perry and others did also willfully conspire and combine to knowingly participate in a scheme to defraud financial institutions, non-bank: lenders, and captive auto finance companies, whereby they willfully submitted materially false information, with the specific intent to defraud the lenders, which caused wire communications to be transmitted in interstate commerce to help carry out the scheme to defraud."

*United States of America v. Dwight Perry*,  case no.: 2:14-CR-00300-VEH-SGC (N.D. AL. 2015)(plea agreement entered February 3, 2015).

118.    As a result of the conspiracy alleged above, plaintiff was deceived by the conspiracy into believing they had good credit and could afford to make payments for vehicles sold and financed by the conspiracy.  The Plaintiff was lured into executing contracts with the co-conspirators which were based upon financing approvals by third parties who had been provided false and deceptive information by the co-conspirators.

119.    As a proximate result of the conspiracy, Plaintiff was injured and damaged.

**WHEREFORE**, Plaintiff respectfully prays that this Court:

1.    Assume Jurisdiction of this case;

2.    Empanel a jury to hear the issues in this case pursuant to Rule 38 of
      the Federal Rules of Civil Procedure and 42 U.S.C.§ 1981a (c)(1);

3.    Award to Plaintiff actual and treble damages to be established at trial
      pursuant to Racketeer Influence and Corrupt Organizations Act
      ("RICO"), 18 U.S.C. § 1964(c);

4.    Award to Plaintiff costs and attorney fees pursuant to RICO, 18
      U.S.C. § 1964(c);

5.    Award to Plaintiff damages pursuant to FCRA, 15 U.S.C. §1681o;

6.    Award to Plaintiff damages pursuant to FCRA, 15 U.S.C. §1681n;

7.    Award other such damages pursuant to the Fair Credit Reporting Act;

8.    Award to Plaintiff actual, compensatory, and punitive damages to be
      established at trial for fraud;

9.    Award to Plaintiff actual and compensatory damages to be established
      at trial for  negligent misrepresentation;

10.   Award to Plaintiff, damages, including punitive damages, to be
      established at trial for fraud;

11.   For a judgment against Defendants for compensatory damages in an
      amount to be proven at trial;

12.   Award to Plaintiff such other relief to which Plaintiff is entitled and

that is deemed appropriate by the Court.

**PLAINTIFF DEMANDS TRIAL BY STRUCK JURY**

Respectfully Submitted on this, the 4th day of September, 2015.

*/s/ Thomas C. Donald*
Thomas C. Donald
ASB-6795-A47D, DON041
Law Office of Thomas C. Donald, LLC
1707 29th Court South
Birmingham, AL 35209
Phone: 205 985 2309
Fax: 205 802 7083
Email: cdonald@donaldlawfirm.com

*/s/ Michael E. Parrish*
Michael E. Parrish
ASB-5747-S69M, PAR075
PARRISH & THEUS, LLC
1707 29th Court South
P.O. Box 590067
Birmingham, AL 35259-0067
Phone: 205 326 0026
Email: mike.parrish@parrish-theus.com

PLEASE SERVE DEFENDANTS AT THE FOLLOWING ADDRESSES:

**Serra Nissan/Oldsmobile, Inc.**
c/o/ Anthony F. Serra
9709 Parkway East
Suite D
Birmingham, AL 35215

**Serra Automotive Management, Inc.**
9709 Parkway East
Suite D
Birmingham, AL 35215

**Dwight Perry**
1400 5th Avenue North
Birmingham, AL 35203

**Abdul Islam Mughal**
6525 Service Road
Trussville, AL 35173